Opinion issued June 29, 2006















In The

Court of Appeals

For The

First District of Texas






NO. 01-04-00709-CV






CHRISTOPHER SANDERS and MARY ANN SANDERS, Appellants


V.


STEVEN HEROLD and BETH ANN HEROLD, Appellees






On Appeal from the 113th Judicial District Court

Harris County, Texas

Trial Court Cause No. 2003-03632






O P I N I O N

 This is an appeal from a summary judgment rendered in favor of appellees,
Steven and Beth Ann Herold ("the Herolds"). Appellants, Christopher and Mary Ann
Sanders ("the Sanderses"), filed a negligence suit for damages arising out of the
molestation of the Sanderses' youngest daughter, J.S. by the Herolds' teenaged son,
Michael. The Herolds filed a traditional motion for summary judgment, which the
trial court granted. In three issues, the Sanderses contend that (1) one could
reasonably infer from the evidence that the Herolds knew or should have known of
their son's dangerous propensities, so as to impose a duty upon them to protect J.S.
from the sexual assault perpetrated upon her; (2) they presented sufficient evidence
from which people could reasonably infer that the Herolds' conduct demonstrated a
conscious indifference to an extreme risk, so as to defeat the Herolds' motion for
summary judgment on their gross negligence claim; and (3) the trial court erred in
granting summary judgment. We affirm.

BACKGROUND

 On November 24, 2001, the Sanderses invited the Herolds and two of their
children, Michael and Karen, to their home for dinner, as they had done on numerous
other occasions. After dinner, while their parents remained downstairs, Michael
Herold and the Sanderses' three children, including J.S., went upstairs. At the time,
Michael was sixteen years old and J.S. was seven years old. Karen Herold, the
younger of Michael's two older sisters, later went upstairs and discovered J.S. and
Michael in J.S.'s room with the door locked. Karen went downstairs to report that
something was wrong between Michael and J.S. After the parents separated J.S. and
Michael, the Sanderses believed that something sexually inappropriate had occurred. 
The Herolds took Michael and went home, where Michael told his father what he had
done. In the meantime, the Sanderses called the police and asked Mr. Herold to bring
Michael back to the Sanderses' house. Michael admitted that he had been sexually
abusing J.S. for some time. That night, the police took Michael to a juvenile
detention facility. Michael later pleaded guilty to sexual assault. Before the
Sanderses took J.S. to Texas Children's Hospital for a rape kit, Mrs. Herold revealed
to Mrs. Sanders for the first time that Melinda Herold Morris, their oldest daughter,
had been sexually assaulted as a child. The next day, November 25, Melinda told her
parents that she had sexually abused her brother Michael when he was a child. The
Herolds, in turn, revealed this to the Sanderses.

 The Sanderses alleged that the Herolds were negligent and grossly negligent. 
The negligence claims against the Herolds specifically addressed the Herolds' (1)
failure to act as reasonable and prudent parents would act in seeking counseling or
other medical help for their children, Michael and Melinda, (2) failure to supervise
their children, Michael and Melinda, and (3) failure to warn third parties of the
anticipated dangers associated with permitting Michael and Melinda to have
unsupervised access to the Sanderses' children. In the following paragraph, the
petition also alleged that the Herolds had a duty to warn the Sanderses that their
children had been molested.

 If the Herolds had advised the Sanders [sic] about Melinda's history of
abuse, suicidal tendencies, and incomplete therapy, the Sanders [sic]
would more fully have appreciated the significance of the Herolds'
cavalier behavior toward their children with respect to sexual matters
and the sexually oriented behavior of Michael Herold and would not
have allowed any of the Herold children to be alone with any of their
children.


 The Herolds moved for summary judgment on the ground that they owed no
duty to the Sanderses or J.S. The trial court granted the Herolds' traditional motion
for summary judgment without stating any grounds.

STANDARD OF REVIEW

 In reviewing a summary judgment, an appellate court must consider whether
the successful movant at the trial level carried its burden of showing that there was
no genuine issue of material fact and that judgment should be rendered as a matter of
law. Tex. R. Civ. P. 166a(c); KPMG Peat Marwick v. Harrison County Hous. Fin.
Corp., 988 S.W.2d 746, 748 (Tex. 1999). We assume all of the nonmovant's
evidence is true and indulge every reasonable inference in favor of the non-movant. 
Sci. Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997). A defendant is
entitled to summary judgment if the evidence disproves as a matter of law at least one
element of each of the plaintiff's causes of action or if it conclusively establishes all
elements of an affirmative defense as a matter of law. Randall's Food Mkts., Inc., v.
Johnson, 891 S.W.2d 640, 644 (Tex. 1995).

PARENTAL DUTY

 In issues one and three, the Sanderses contend that the trial court erred in
granting summary judgment for the Herolds because the Herolds did not conclusively
negate the duty element of the Sanderses' negligence cause of action. Specifically,
the Sanderses argue that they provided enough evidence to raise a genuine issue of
material fact on the existence of a parental duty. 

1. How does the Court Determine Duty in a Summary Judgment Proceeding?

 Whether to impose a duty under certain circumstances is a question of law. See
Walker v. Harris, 924 S.W.2d 375, 377 (Tex. 1996). However, this legal question is
decided based on the particular facts of the case. See Redinger v. Living, Inc., 689
S.W.2d 415, 418 (Tex. 1985). If the facts are disputed, and one version of the facts
would support the imposition of a duty, summary judgment is improper. See Mitchell
v. Missouri-Kansas, Texas R.R. Co., 786 S.W.2d 659, 662 (Tex. 1990). "The
existence of duty is a question of law when all of the essential facts are undisputed,
but when the evidence does not conclusively establish the pertinent facts or the
reasonable inferences to be drawn therefrom, the question becomes one of fact for the
jury." Id. (quoting Bennett v. Span Indus., Inc., 628 S.W.2d 470, 474 (Tex.
App.--Texarkana 1981, writ ref'd n.r.e.)). Thus, in a summary judgment proceeding,
if the nonmovant's version of the facts would support the imposition of a legal duty,
summary judgment for the defendant based on a claim of no duty is inappropriate.

2. When is a Parental Duty Imposed?

 "The mere fact of paternity or maternity does not make a parent liable to third
parties for the torts of his or her minor child." Rodriguez v. Spencer, 902 S.W.2d 37,
42 (Tex. App.--Houston [1st Dist.] 1995, no writ). As a general rule, minors are
liable for their own torts. Id. (citing Williams v. Lavender, 797 S.W.2d 410, 412
(Tex. App.--Fort Worth 1990, writ denied)). A parent may be held vicariously liable
for his minor's torts under the theories of respondeat superior or joint enterprise. 
Rodriguez, 902 S.W.2d at 42; see de Anda v. Blake, 562 S.W.2d 497, 499 (Tex. Civ.
App.--San Antonio 1978, no writ). Additionally, a parent may be held directly liable
for his minor's torts if he permits the minor to act in a manner likely to cause injury
to another. Id. at 42; Moody v. Clark, 266 S.W.2d 907, 912 (Tex. Civ.
App.--Texarkana 1954, writ ref'd n.r.e.). Such negligence may be shown when the
parent carelessly fails to restrain a child known to have dangerous tendencies. 
Rodriguez, 902 S.W.2d at 42; Moody, 266 S.W.2d at 912. A child is "known to have
dangerous tendencies" if the parent can anticipate the danger his child may pose to
third parties. Rodriguez, 902 S.W.2d at 42. "Actual knowledge is not required if the
parent should, under the circumstances, reasonably anticipate the consequences of
his or her actions." Id. (citing Way v. Boy Scouts of Am., 856 S.W.2d 230, 234 (Tex.
App.--Dallas 1993, writ denied)). A parent's duty to protect third parties from the
acts of the parent's minor child depends on whether the injury to the third party is
foreseeable, as evidenced by the parent's knowledge of, consent to, sanction of, or
participation in the child's activities. Rodriguez, 902 S.W.2d at 43.

3. Cases Interpreting Parental Duty

 a. Cases Holding Criminal Conduct Not Foreseeable

 In Milligan v. Soto, 2001 WL 703910, *1 (Tex. App.--Amarillo, not
designated for publication), defendant Soto provided day care for plaintiff Milligan's
three children. Soto's 14-year-old son, who was mentally retarded, sexually molested
two of Milligan's children. The only evidence of foreseeability presented was Soto's
son's mental retardation. The court of appeals held that Soto did not owe Milligan
a duty because "[t]he evidence affirmatively showed that [Soto's son] did not have
disciplinary problems, engage in criminal conduct or sexual activity before, or ever
express sexual interest in young children." Id. at *3.

 In Childers v. A.S., 909 S.W.2d 282, 285 (Tex. App.--Fort Worth 1995, no
writ), the Childerses, plaintiffs, filed suit against the parents of A.S., a neighbor child
who had forced the Childerses' daughter to participate in sexual "games." The only
evidence of foreseeability offered by the Childerses was that A.S. "had a temper that
she lost easily." Id. at 288. The Court held that A.S.'s parent's owed no duty to the
Childerses or their daughter. Id. at 289.

 In Rodriguez v. Spencer, Paul Broussard was killed by four adults and five
minors in a "gay-bashing" incident. 902 S.W.2d at 39-40. Broussard's mother sued 
Spencer, the mother of one of the minors involved in the murder. Id. The Spencers
moved for summary judgment, which the trial court granted, contending that they
owed no duty to Broussard. Id. The summary judgment evidence showed that
Spencer's son had average grades in school and was not a discipline problem. Id. at
43-44. Prior to the incident, Spencer had never known her son to exhibit violent
tendencies. Id. On the night of the incident, Spencer's son was supposed to be
spending the night with a friend that Spencer knew and trusted. Id. This Court held
that there was "no reason for [Spencer] to know, or even suspect, that her son might
become involved in conduct such as the heinous crime committed against Paul
Broussard." Id. at 45. 

 In Doe v. Franklin, 930 S.W.2d 921, 922, 23 (Tex. App.--El Paso 1996, no
writ), a minor sued her grandmother for negligently allowing her to be molested by
her grandfather. The grandmother moved for summary judgment, contending she had
no duty. The court of appeals held that "[i]t is foreseeable that a child will be
victimized if left alone or brought into close proximity with a pedophile" and that "a
duty exists to not place a child in a situation in which the risk of sexual abuse is
heightened and in which the risk is foreseeable." Id. at 928-29. The child presented
evidence that she had told her grandmother that her grandfather was abusing her. Id.
at 923. The grandmother denied such knowledge. Id. Because there was a fact
question on the issue of the grandmother's knowledge of the risk posed by the
grandfather (i.e., negligence), the court of appeals reversed and remanded. Id. at 929.

 b. Cases Holding Criminal Conduct Foreseeable

 In Isbell v. Ryan, 983 S.W.2d 335, 337 (Tex. App.--Houston [14th Dist.] 1998,
no pet.), the plaintiff, Isbell, sued her stepson's mother, Ryan, after the stepson
molested Isbell's two young daughters. Id. at 337. The stepson had been accused of
molesting a cousin the year before Isbell's daughters were molested. Id. Child
Protective Services told Ryan that there "was reason to believe that [her son] was
responsible for the sexual and physical abuse of [the cousin]," but that the agency did
not plan to take further action unless it received another report. Id. Although Isbell
knew about the CPS investigation, she alleged in her petition that Ryan had misled
her into believing that CPS had concluded that the allegations against the stepson
were groundless. Id. Ryan moved for summary judgment, contending that she had
no duty to Isbell or her daughters. Id. at 338. The trial court granted Ryan's
summary judgment. Id. The court of appeals reversed, holding that Ryan had a duty
to the Isbells because she "could have reasonably anticipated the danger of allowing
[her son] to go to the Isbell home without giving the Isbells adequate warning of the
possibility of danger to [her son's] half-sisters." Id. at 341.

 c. Other Types of Cases Examining Foreseeability of 3rd Party Criminal
Conduct.


 In Cain v. Cain, 870 S.W.2d 676, 678-80 (Tex. App.--Houston [1st Dist.]
1994, writ denied), a minor sued her uncle after she was molested by her uncle's son-in-law, while staying at her uncle's home. On appeal, the uncle argued that the trial
court erred by submitting the minor's negligence claim to the jury because he owed
no duty to protect her from torts committed by his son-in-law, a third party. Id. at
680. The court of appeals held that the jury charge was properly submitted because
the son-in-law's crime was the foreseeable result of the uncle's failure to warn the
minor and her mother that another member of his household was a convicted child
rapist. Id. 

 In Golden Spread Council, Inc. v. Akins, 926 S.W.2d 287, 289 (Tex. 1996), a
boy scout who was molested by his scoutmaster brought suit against the regional
council of the Boy Scouts, alleging that it was negligent in recommending the
scoutmaster to the troop. The council filed a motion for summary judgment
contending that it owed no duty to the boy. Id. at 289. The Supreme Court held that
the injury to the boy was foreseeable to the council because it knew that the
scoutmaster had been previously accused of "'messing with' some boy scouts" and
that, at the time, the council was concerned that the allegations might be serious. Id.
at 290. The court held that "if [the council] knew that the scoutmaster was peculiarly
likely to molest boys, it had a duty not to recommend him as a scoutmaster." Id. at
292.

 We note that the scoutmaster's previous behavior of "messing with" some
boys, of which the council was aware, is similar to the act of molestation giving rise
to that suit. Id. at 290. Similarly, in Cain, the son-in-law was a convicted child
rapist, making his conduct in molesting the defendant's niece foreseeable. 879
S.W.2d at 680. Therefore, we note that foreseeability is often determined by whether
the defendant is aware of prior, similar behavior by the third party.

 4. Did the Herolds Prove As a Matter of Law That Their Son's Conduct was
Not Foreseeable?


 In their motion for summary judgment, the Herolds contend they owed no duty
because (1) they did not know that Michael had been sexually abused by Melinda,
and (2) Michael's actions against J.S. were not foreseeable. In support of their
assertions that they neither knew nor should have foreseen that Michael was a danger
to others, the Herolds pointed to evidence from their deposition testimony, their
affidavits, and the deposition testimony of their children, Michael and Melinda. The
Herolds contend that, prior to November 25, 2001, the day after the incident giving
rise to this suit, they did not know that Michael had been molested by Melinda. In
the Herolds' affidavits and in Beth Herold's deposition testimony, they provided
evidence that, prior to the day of the incident, Michael was a member of his high
school choir and his church youth group, was doing well in school, had no
disciplinary problems, did not use drugs, never had been in trouble with the law, and
had never vandalized property. In Melinda and Karen Herolds' depositions, they
provided evidence that neither Karen nor Melinda had ever seen pornographic
material in their parents' home and had never seen or heard of Michael watching or
looking at pornographic material. The Herolds also provided evidence that Michael
never had been accused of or suspected of molesting anyone, and they never
discovered Michael behind a locked door with another child or sibling.

 In their response to the Herolds' motion for summary judgment, the Sanderses
introduced the following summary judgment evidence, which they contend raises a
fact issue on whether the Herolds knew or should have known that Michael was
dangerous: (1) Michael's sister, Melinda, was sexually abused when she was 8 or 9;
(2) five years later Melinda exhibited suicidal inclinations that Melinda herself
attributed to her earlier abuse; (3) Melinda told neither parent about the sexual abuse
or the suicidal inclinations until forced to do so; (4) Melinda exhibited severe
emotional disturbance when she was undergoing professional therapy; (5) Melinda's
therapy was abruptly terminated by Melinda without approval of the therapist while
Melinda was in the midst of her severely disturbed behavior; (6) at the same time that
Melinda had access to Michael without supervision, Michael, who was then a very
young child, began to pick the lock on his parents bedroom door on a frequent basis
and see his parents in moments of sexual intimacy; (7) Michael's voyeurism was so
intense and persistent that his parents could not stop his behavior directly but had to
hide in the closet to escape his pursuit of them in intimate moments; (8) as a 16-year-old boy, Michael preferred the company of younger children, including girls the age
of 7 and 9, over people his own age; (9) Michael enjoyed pornography in the presence
of, and with the encouragement of, his father; (10) Michael was subjected to
discussion by his parents of explicit sexual acts and topics; (11) society's growing
awareness and concern over child abuse has been judicially noticed as early as 1986,
when the Texas Legislature passed legislation for the purpose of insuring the
reporting of sexual abuse of children; and (12) that it is commonly known that sexual
abuse of one child can start a cycle of child abuse.

 The gist of the Sanderses' argument is that the Herolds knew or should have
known that Melinda had molested Michael as a child, and that, as a result, the Herolds
knew or should have known that Michael would, in turn, molest another child. 
However, even accepting that sexual abuse may be cyclical in some cases, we will
not impose a duty on parents to warn others that their child has been abused. Such
a duty would stigmatize all victims of sexual abuse as potential perpetrators of sexual
abuse. Instead, there must be some evidence, other than the fact of their child's
abuse, available to the parents of the abused child that would make it foreseeable to
them to that their child was likely to sexually abuse another.

 In this case, the evidence, considered in the light most favorable to the
Sanderses as nonmovants is as follows:

 (1) Melinda was molested.

 (2) Melinda molested Michael when he was a young child, a fact the
Herolds did not discover until after Michael was arrested.


 (3) At the age of 4 or 5, Michael exhibited voyeuristic tendancies.

 (4) As a teenager, Michael enjoyed the company of younger children.

 (5) As a teenager, Michael viewed pornography and was raised in a 
household where sexual topics were frequently discussed in front
of the children.


 Assuming that the Herolds knew that Michael had been molested as a child,
and that sexual abuse can be cyclical, there is nothing in the evidence detailed above
to show that the Herold's were aware, or should have been aware, that Michael was
likely to continue the cycle of sexual abuse. He was never known to be with another
child under inappropriate circumstances. There is nothing in the record to suggest
that Michael's voyeuristic tendencies continued past early childhood. Likewise, there
is nothing in the record to suggest that Michael's viewing of pornography included
viewing child pornography or anything else that would suggest that he had an
inappropriate sexual interest in younger children. While the evidence shows that
Michael enjoyed the company of younger children, there was no evidence that, prior
to the incident giving rise to this lawsuit, Michael's interest in younger children was,
in any way, sexually inappropriate.

 Because there is no evidence that Michael's parents were aware of his
"dangerous tendencies" or could "anticipate the danger" he posed to other children,
the Heralds had no duty to warn the Sanderses that he was dangerous. (1) 5. Can Negative Interences be Drawn from the Fact that the Herolds'
Children Invoked their Fifth Amendment Rights? 


 Nevertheless, the Sanderses argue that, because Melinda and Michael asserted
their Fifth Amendment rights to various questions posed during their depositions, a
negative inference can be drawn that their parents knew Michael had been abused and
was abusing J.S. This Court has stated that, after a party has pled the Fifth
Amendment, "if . . . evidence gives rise to two equally consistent inferences so that
neither inference is more probable than the other, neither inference can be made." 
Tex. Capital Sec., Inc. v. Sandefer, 58 S.W.3d 760, 780 (Tex. App.--Houston [1st
Dist.] 2001, pet. denied) (emphasis added); cf. Baxter v. Palmigiano, 425 U.S. 308,
318-19, 96 S. Ct. 1551, 1558 (1976) (holding that Fifth Amendment does not forbid
adverse inferences to evidence offered against one in a civil trial). Although Michael
invoked his Fifth Amendment rights to questions about whether his parents knew of 
his abuse of J.S. prior to November 24, 2001, and although Melinda also invoked her
Fifth Amendment rights to similar questions concerning her abuse of Michael, two
equally consistent inferences can be drawn: (1) neither Michael nor Melinda wanted
to be charged with additional crimes of molestation, (2) or (2) Michael and Melinda
sought to protect their parents' knowledge of Michael's abuse and J.S.'s abuse. 
Contrary to the Sanderses' argument, neither inference is more probable than the
other; thus, we cannot draw a negative inference with respect to the Herolds'
knowledge from their children's assertion of their own Fifth Amendment privilege. 
See Sandefer, 58 S.W.3d at 780. Therefore, Melinda's and Michael's invocation of
their Fifth Amendment rights is no evidence that their parents were aware of
Michael's or J.S.'s abuse.

6. Summary

 Based on the evidence showing what the Herolds knew about Michael, or
through the exercise of reasonable care should have known, the Herolds could not
have reasonably anticipated the danger Michael posed to others. Thus, Michael's
actions were not foreseeable to his parents. Under these facts, we hold that the
Herolds had no duty to protect J.S. from Michael's actions. See, e.g. Golden Spread
Council, Inc., 926 S.W.2d at 292; Rodriguez, 902 S.W.2d at 42 n.5 ("If the reason to
anticipate an injury is not established, then no duty arises to prevent the injury."). 
Accordingly, we overrule appellant's first and third issues.

MALICE

 In their second issue, the Sanderses contend that the trial court erred in granting
summary judgment for the Herolds because they presented sufficient evidence from
which it could be reasonably inferred that the Herolds' conduct demonstrated a
conscious indifference to an extreme risk so as to defeat the Herolds' motion for
summary judgment on the gross negligence claim. 

 In light of our disposition of issue one, we need not address this issue. 
Although we agree that gross negligence refers to a different character of conduct,
one's conduct cannot be grossly negligent without being negligent. Trevino v.
Lightning Laydown, Inc., 782 S.W.2d 946, 949 (Tex. App.--Austin 1990, writ
denied). We overrule appellant's second issue.

CONCLUSION

 We affirm the judgment of the trial court.



 

 Sherry Radack

 Chief Justice



Panel consists of Chief Justice Radack and Justices Alcala and Bland.


1. 
 ' 
 
 ' 
 
 
2.